UNITED STATES of America, Plaintiff,

v.

RUST COMMUNICATIONS GROUP, INC., Licensee of Radio Station WRNL, Richmond, Virginia, Defendant.

Civ. A. No. 75–0624–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 15, 1976.

**1030**

David A. Schneider, Asst. U.S. Atty., Dept. of Justice, Richmond, Va., for plaintiff.

Stanley S. Neustadt, Cohn & Marks, Washington, D. C., A. C. Epps, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, the United States of America, brings this action pursuant to 47 U.S.C. §§ 503–04, to recover a forfeiture assessed by the Federal Communications Commission (Commission). The defendant, Rust Communications Group, Inc., is the owner and operator of radio station WRNL, Richmond, Virginia. Jurisdiction over this matter is attained pursuant to 28 U.S.C. §§ 1345, 1355. The matter comes before the Court on a trial *de novo* on the issue of liability. The Court has taken evidence, considered arguments of counsel, and renders its findings of fact and conclusions of law as follows:

The Commission is the agency of the United States charged with the duty of enforcing and executing provisions of the Communications Act of 1934, 47 U.S.C. § 151 *et seq*. The defendant, as licensee of a broadcast station, is subject to the rules and regulations promulgated by the Commission. After appropriate proceedings, the Commission on April 9, 1974 concluded that Rust had repeatedly violated § 73.52(a) of the Commission's rules and regulations on antenna input power. 47 C.F.R. § 73.-52(a).[1] *See generally Niagara Frontier Broadcasting Corp.,* —— F.C.C.2d ——, 36 R.R.2d 1584 (1976); *Paul A. Stewart,* 45 F.C.C. 773 (1963). The Commission has assessed forfeiture liability of $1,000 against the defendant under 47 U.S.C.

---

1. That regulation provides in pertinent part:

    (a) The actual antenna input power of each station shall be maintained as near as is practicable to the authorized antenna input power and shall not be less than 90 percent nor greater than 105 percent of the authorized power; except that if, in an emergency, it becomes technically impossible to operate with the authorized power, the station may be operated with reduced power for a period of not more than 30 days without further authority from the Commission . . .

§ 503(b)(1)(B).[2] A subsequent appeal to the Commission for a remission was denied. The defendant, electing to have the matter heard *de novo* in this Court, has refused to pay the assessment, asserting that it is "unwarranted and illegal." 47 U.S.C. § 504(a).

The Commission found that on seven occasions in 1972, WRNL had operated with excess power. The station is licensed by the Commission to operate on the frequency of 910 kHz. with a power of five thousand watts. Section 73.52(a) of the Commission's Rules and Regulations provides in part: "The actual antenna input power of each station shall be maintained as near as practicable to the authorized antenna input power and shall not be less than 90% nor greater than 105% of the authorized power . . . ." Since station WRNL has an authorized antenna input power of 5,000 watts the section would permit power increases to the level of up to 5,250 watts. The Commission's method of determining the power at which the defendant allegedly operated on the seven days in question was the so-called "direct" method specified in Section 73.14(g) of the Commission's Rules:

(g) Antenna power. "Antenna input power" or "antenna power" means the product of the square of the antenna current and the antenna resistance at the point where the current is measured. 47 C.F.R. § 73.14(g). The "antenna resistance" is an assumed constant figure, calculated in this case to be 49.95 ohms. For directional antennas (station WRNL was operating in a directional mode at the time of the alleged violations),[3] the term "antenna current" refers to the antenna current at the common point, or the "common point current." The value of the "common point current" is taken from readings taken at one half hour intervals from a "common point R.F. ammeter" (common point meter) at the station and entered in the station's logs.[4] The operating logs for the days in question were entered in evidence; there is no allegation that the readings were negligently or improperly made.

The Commission found that the defendant was operating at "excessive power" whenever the log reflected a meter reading of greater than 10.25 ampers, the square root of the highest permissible antenna power (5,250 watts) divided by the antenna resistance (49.95 ohms.)[5] The Commission

2. (b)(1) Any licensee or permittee of a broadcast station who—

      *    *    *    *    *    *

(B) willfully or repeatedly fails to observe any of the provisions of this chapter or of any rule or regulation of the Commission prescribed under authority of this chapter or under authority of any treaty ratified by the United States,

      *    *    *    *    *    *

shall forfeit to the United States a sum not to exceed $1,000. Each day during which such violation occurs shall constitute a separate offense. Such forfeiture shall be in addition to

any other penalty provided by this chapter. 47 U.S.C. § 503(b)(1)(B).

3. The station is not radiating the same energy levels in every direction but is suppressing radiation in a particular direction so that its service contour is skewed from a perfect circle.

4. The Commission has since changed its rules so that reading is now only necessary at three hour intervals.

5. Under 47 C.F.R. § 73.14(g), antenna power may be seen to be the product of the following equation:

$$\text{highest permissible antenna power (105\% of authorized power)} = (\text{Common point current})^2 \times \text{antenna resistance}$$

$$5{,}250 \text{ watts} = (10.25)^2 \text{ amps} \times 49.95 \text{ ohms}$$

By utilizing this formula, the Commission found the violations to be as follows:

| Date | Maximum Authorized Power | Actual Power in Use As Calculated by the FCC |
|---|---|---|
| 2/14/72 | 5250 w | 6043 w |
| 2/15/72 | 5250 w | 5612 w |
| 2/22/72 | 5250 w | 5506 w |
| 2/23/72 | 5250 w | 5934 w |
| 2/24/72 | 5250 w | 5612 w |
| 3/ 5/72 | 5250 w | 5506 w |
| 3/ 6/72 | 5250 w | 5506 w |

implicitly assumed that the log entries for the common point meter were conclusive evidence of the *actual* value of the common point current amperage at any one time. Expert testimony introduced at trial, however, indicates that the meter has a significant margin of error or zone of accuracy. The evidence satisfies the Court that within a specified percentage of the meter reading, the instrument is not a meaningful indicator of value gradients. Indeed, the Commission's rules specify error ranges that are permissible for the various meter instruments that are employed to read the common point current amperage. See 47 C.F.R. §§ 73.39, 73.67. Calculations from these sections indicate that station WRNL's primary meter located at the station's transmitter has a permissible error range of 3%, and that the station's remote meter located in the control room to relay readings from the primary meter has a permissible error range of 2%. The total margin of error for the two instruments may validly be as much as 5%. To illustrate, if WRNL's instruments were reliable only to the limits of the permissible range, a log book entry of 10.0 ampers would indicate an actual amperage value of anywhere from 9.50 to 10.50 ampers.

Unfortunately, no specific evidence was introduced on the calibrated margins of error for the particular instruments in question. Since the Commission does not take issue with the accuracy of the WRNL instruments, the Court must assume that they did operate normally within the legally specified accuracy limitations. The defendant has demonstrated, however, that the meters were, through age and inferior installation, sufficiently inaccurate to approximate the boundaries of the legal limitations. These deficiencies were discovered by the defendant when the station was purchased five months prior to the dates of the alleged violations and have since been replaced in the station's general remodeling. Accordingly, the Court concludes that the total margin of error for the WRNL common point current meter instruments is approximately 5%. In asserting this error range into the equation of Section 73.14(g), the Court concludes that the instruments could validly cause a 12.5% error in antenna power calculations.

██ Since on five of the seven days in issue WRNL was operating within 12.5% of the maximum permissible power setting, the question is presented as to whether the Commission's rules and regulations allow for such a zone of error in its antenna input power prohibitions or do the Commission's rules and regulations require that the calculated value of the antenna power fall within the authorized range? Section 73.52 speaks only in terms of absolute values and allows *an actual* variance of 10% below or 5% above the authorized power. The section is also modified by the indefinite phrase— "as near as practicable." The Commission has interpreted the regulation to prohibit power settings that are calculated, based on log entries, to be 10% below or 5% above the authorized power; log entries are accepted as *prima facie* indications of the actual common point current amperage in the power equation. See *Kalamazoo Broadcasting Co., Inc.,* 29 F.C.C.2d 441 (1970).[6] Ordinarily, the interpretation of a

---

6. *Kalamazoo Broadcasting Co., Inc.,* 24 F.C.C.2d 441 (1970), does not adequately clarify the Commission's position on the matter. Indeed, language in the case suggests that log entries may *not* be *per se* indications of actual power output:

. . . [A] log entry of 3.0 amps would indicate that WKPR was being operated more that 105 percent above its authorized pre-sunrise power. In this respect, the station's operators should have taken immediate steps to see whether the station was, *in fact* exceeding its authorized pre-sunrise power, and if so, should have corrected the situation. 24 F.C.C.2d at 445 (emphasis added). The plaintiff argues that the language in context refers only to whether or not the operators were accurately reading the meters, but the generality of the language seems to indicate otherwise. In any case, it would be a simple matter for the Commission to deal with the matter directly in their regulations and preferable to leaving regulated parties to conjecture about the intricacies of language in particular opinions.

statutory or regulatory provision by the officers or agency charged with its administration and enforcement is entitled to considerable deference. *See, e. g., United States v. National Association of Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975); *Investment Company Institute v. Camp,* 401 U.S. 617, 626–27, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). The doctrine is mollified, however, if agency action is penal in nature, for our constitutional concepts of notice indicate that individuals and organizations be specifically put on notice of government sanctions before they are levied. *See M. Kraus & Bros. v. United States,* 327 U.S. 614, 621–22, 66 S.Ct. 705, 90 L.Ed. 894 (1946). *See generally Boyce Motor Lines v. United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1950). *Cf. Cramp v. Board of Public Construction of Orange County, Florida,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Lanzetta v. The State of New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Such notice serves to give fair warning to persons potentially subject to the sanctions and serves to restrict arbitrary and discriminatory enforcement of same. Section 73.52, applied penally, was not written with the specificity required to support the Commission's position. Furthermore, the Commission's position seemed somewhat inconsistent with the theory of Sections 73.39 and 73.67 which allow for instrument error. In short, the defendant quite reasonably interpreted the section differently from the Commission, and cannot be punished within the bounds of the Constitution for such interpretation.

On the remaining two days in issue, one hour on each day, the station's logs of common point current amperage indicate that under the direct method of calculating antenna input power, the station exceeded the authorized power limit by more than 12.5%. This evidence, without more, would establish a violation of Section 73.52 under both the Commission's and the defendant's interpetations. Thus, it becomes incumbent to the defendant to show that the log entries in question do not accurately reflect the actual power in use. The defendant introduced independent and uncontradicted evidence to the effect that the high readings of common point current amperage were due to isolated periods of meter malfunction. During the periods in controversy and in accordance with the Commission's rules and regulations, readings of a number of meters other than the antenna current meter were entered in the station's logs. Readings on the plate voltage and plate current meters did not increase in comparable magnitude to the increase in readings for the common point current amperage, as the laws of physics would dictate. Indeed, an alternative method of measuring antenna input power—the so-called indirect method—is based upon readings of the plate voltage and plate current. While the indirect method is not preferred by the Commission[7] and the evidence indicates that calculations of the indirect method type were not attempted by the defendant until after the Commission noted potential liability for the days in question, the indirect method does provide evidence of a malfunction in the common point meter. If all meters are reading properly except the common point current amperage meter, one could reasonably assume malfunction of that meter. Expert evidence was introduced that noted that such isolated erratic meter indications could have been caused by the effects of cold weather on meter wiring; noticeable drops in temperature were recorded for the two days in issue. In conclusion, the Court finds that the defendant has sustained their burden of satisfying the Court that the station was not operating in excess power on either of the two days.

An appropriate order will issue.

---

7. See 47 C.F.R. § 73.51(a), (d).