**MIAMI MDS COMPANY, et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Respondent.**

No. 92–1341.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1993.

Decided Feb. 15, 1994.

W. Randolph Young, Washington, DC, argued the cause and filed the briefs, for appellants.

James M. Carr, Counsel, F.C.C., argued the cause, for appellee. With him on the brief were Renee Licht, Acting Gen. Counsel, F.C.C., Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., and John E. Ingle, Deputy Associate Gen. Counsel, F.C.C.

Before: MIKVA, Chief Judge, and WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Petitioners held permits issued by the Federal Communications Commission to con-

struct stations for "multipoint distribution service" or "MDS", a type of fixed radio facility for common carrier service.[1] Each permit specified its expiration date. After the petitioners secured various extensions (one in the case of petitioner Miami MDS, three in the case of petitioner Boston MDS), the Commission's Common Carrier Bureau ultimately denied extension requests for each petitioner (in March 1988 as to Miami, in April 1988 as to Boston), for want of due diligence. In each case the denial decision ordered the petitioner to return its permit for cancellation. Each petitioner immediately ordered the necessary equipment. On its receipt each filed an application for reconsideration, at the same time undertaking construction in earnest. Each petitioner managed to complete construction within two months of the Bureau's denial, and filed suitable forms certifying completion. On May 24, 1989, nearly a year after the stations were completed, the Bureau denied the petitioners' applications for reconsideration; more than three years later, the Commission itself denied their applications for review and imposed monetary forfeitures. 7 F.C.C.R. 4347 (1992).

Petitioners' principal claim is that their construction permits were extended as a matter of law even after the Bureau's formal denial of the last extension requests, so that their post-denial construction surges fulfilled the requirements of their permits. Such fulfillment would normally lead to receipt of operating permits.[2] The supposed source of this automatic extension is the third sentence of § 9(b) of the Administrative Procedure Act, 5 U.S.C. § 558(c), which reads as follows:

> When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire

until the application has been finally determined by the agency.

5 U.S.C. § 558(c). Because the construction permits do not qualify as "license[s] with reference to an activity of a continuing nature", this sentence of § 558(c) does not apply.

■ First, we reject a view of § 558(c)'s third sentence, offered by the Commission, that is plainly wrong. Citing language from our decisions in *Atlantic Richfield Co. v. United States*, 774 F.2d 1193, 1201 (D.C.Cir. 1985), and *Great Lakes Airlines, Inc. v. CAB*, 294 F.2d 217, 222 (D.C.Cir.1961), the Commission argues that the provision affords no protection to a license that expires by its own terms. In each case, however, we spoke about the application of the *second* sentence of § 558(c), which conditions an agency's "withdrawal, suspension, revocation, or annulment" of a license on its provision of notice and an opportunity to be heard. It thus contemplates a license cut short by affirmative agency action. In contrast, the third sentence of § 558(c) supplies continuity in instances where a licensee is seeking "renewal or a new license" and the agency has not gotten around to the issue. Thus it plainly assumes a license that would naturally have lapsed in the absence of affirmative agency action—but for the intervention of § 558(c). The sentence would be a nullity if inapplicable to any permit that expires by its terms.

■ Section 558(c)'s third sentence limits its application to licenses "with reference to an activity of a continuing nature". This precondition was expressed slightly differently by Justice Burton, in a dissent, but in a passage with which, as Judge Friendly later noted, the majority did not quarrel:

> The policy behind the third sentence of [§ 558(c)] is that of protecting those per-

---

**1.** Commission regulations define MDS specifically as a "one-way domestic public radio service rendered on microwave frequencies from a fixed station transmitting (usually in an omnidirectional pattern) to multiple receiving facilities located at fixed points". See 47 CFR § 21.2.

**2.** After issuance of the original construction permits, the Commission changed to a system of a

single conditional permit that covers both construction and operation, but which lapses if construction is not completed within the specified deadline. *Revision of Part 21 of the Commission's Rules*, Report and Order, 2 F.C.C.R. 5713, 5717–18 (1987). This structural change is not claimed by either party to affect the issues before us.

sons who already have *regularly issued licenses* from the serious hardships occasioned both to them and to the public by expiration of a license before the agency finds time to pass upon its renewal. *Pan–Atlantic Steamship Corp. v. Atlantic Coast Line*, 353 U.S. 436, 444–45, 77 S.Ct. 999, 1004–05, 1 L.Ed.2d 963 (1957) (emphasis added) (Burton, J., dissenting), quoted in *County of Sullivan v. Civil Aeronautics Board*, 436 F.2d 1096, 1099 (2d Cir.1971) (Friendly, J.). Both § 558(c) itself and Justice Burton's reference to "regularly issued licenses" suggest an activity that is normally carried on indefinitely under licenses that as a regular matter are renewed or replaced with new licenses issued to the current holder. In *Bankers Life & Cas. Co. v. Callaway*, 530 F.2d 625 (5th Cir.1976), the court cited as qualifying licenses ones governing activities "such as radio broadcasting or shipping services", and refused to apply the sentence to the dredge-and-fill permit that stated it would be void on a specified date if the work were not *completed* by that date. *Id.* at 633–34 & 634 n. 13. Here, too, the construction permits involve a one-time activity that was expected to be finished by the licenses' expiration dates, at which time, said the permits, they were to be automatically forfeited. See Joint Appendix 4, 38; see also 47 CFR § 21.44(a)(1) (providing for automatic forfeiture at the expiration of the specified construction period).

Apart from § 558(c), petitioners invoke this court's statement in *MG–TV Broadcasting Co. v. F.C.C.*, 408 F.2d 1257 (D.C.Cir. 1968), that "a construction permit does not 'lapse,' notwithstanding a failure to abide by its terms, until the Commission declares it forfeited". *Id.* at 1261 (citing cases). Whatever the exact scope of that proposition, it has no application here. Besides the permits' expiration by their terms, the Commission, acting through the Common Carrier Bureau, affirmatively rejected applications for extensions and ordered petitioners to return their permits for cancellation.

█ Petitioners allege that in considering applications for extensions or for reinstatements of expired permits, the Commission routinely takes account of progress in con-

struction made after expiration of the initial permit (or of its extension). Of the five cases cited in support, four do not pan out at all. In two cases the Commission *denied* the requested extension, but referred to an earlier one that had been granted. In *Mt. Baker Broadcasting Co., Inc.*, 3 F.C.C.R. 4777 (1988), the *staff* had granted the prior extension in clear reliance on post-expiration work, but the Commission said nothing to endorse that decision. In *GOS Broadcasting Corporation*, 1 F.C.C.R. 314 (MMB 1986), *rev. denied*, 2 F.C.C.R. 1757 (1987), the Bureau observed of the prior extension that it had been "[b]ased on [the permittee's] representation that [it was] *in the process* of rebuilding [an access] road", *id.* at 314 (emphasis added). So far as appears the representation referred to operations being conducted at the time the permittee *filed* its application for an extension, within the previously allowed time. In *Hubbard Broadcasting, Inc.*, 13 F.C.C.2d 56 (1968), the Commission relied on substantial progress "[s]ince grant of Hubbard's prior extension application", 13 F.C.C.2d at 57, with no suggestion that it occurred after expiration of the extra time. And *Radio Longview, Inc.*, 19 F.C.C.2d 966 (1969), states the Commission's policy of taking into account construction completed after the filing of an extension application, 19 F.C.C.2d at 970 n. 4, which must occur at least 30 days *before* expiration, see 47 CFR § 73.3534. The Commission's object was to warn permittees that they could not halt their efforts at due diligence merely on the filing of such an application, 19 F.C.C.2d at 970 n. 4, and it said nothing about the impact of construction taking place after expiration of a permit.

In the fifth case, *In re John J. Tibiletti*, 28 F.C.C.2d 493 (Rev.Bd.1971), the Review Board appeared to rely indiscriminately on progress made in periods before and after expiration of an extended permit. The Board's inattention to the distinction does not add up to much of a precedent.

In fact, more recently the Bureau has refused to allow a permittee to rely on actions taken after a construction permit expired, and indeed asserted that its policy was to disregard progress made after denial of a request for more time. See *Metrovision*,

*Inc.,* 3 F.C.C.R. 598, 602 (MMB 1988), citing *In re Sunrise Broadcasting, Inc.,* 100 F.C.C.2d 1565, 1567 (MMB 1985). See also *In re Station WCNT(TV),* 2 F.C.C.R. 230, 231 (MMB 1987); *In re Station WIUW(TV),* 2 F.C.C.R. 2506 (1987); *In re Station WJCB(TV),* 2 F.C.C.R. 2549 (MMB 1987). Thus the only conscious treatment of the issue that we have found runs directly against petitioners.

We note also that *Tibiletti* and two of the other cases cited by petitioners involved permits under Part 73 before the Commission stiffened extension criteria under those rules in 1985. *In re Amendment of Section 73.-3598 and Associated Rules Concerning the Construction of Broadcast Stations,* 102 F.C.C.2d 1054 (1985) (adopting rules which, if no construction progress has been made, allow extensions only if permittee has taken all possible steps to expeditiously resolve problem); see also 47 CFR § 73.3534. And none of the cases addresses the arguably stricter regime of Part 21, under which MDS licenses are issued. In 1986 the Commission deliberately amended Part 21, adopting "strict requirements for extension of the time allowed for construction". *Revision of Part 21 of the Commission's Rules,* Notice of Proposed Rulemaking, 104 F.C.C.2d 116, 118 (1986). It did so because of what it perceived as a problem of "warehousing", i.e., holding a permit without action and thereby preventing others from using that portion of the radio spectrum, *Revision of Part 21 of the Commission's Rules,* Report and Order, 2 F.C.C.R. 5713, 5721 ¶ 62 (1987), a problem it had found especially prevalent "in two services, DEMS and single-channel MDS", Notice of Proposed Rulemaking at 122 n. 26. The Commission also noted that when at least one extension request was granted, the average construction time rose from eight to 28 months. *Id.* The Commission's solution was to bar any extensions at all for a variety of reasons such as lack of a site or of financing, Report and Order at 5722 ¶ 66, and to limit extensions to situations where the applicant has made diligent efforts to construct *and* either the delay was due to circumstances beyond the applicant's control or "unique and overriding" public interest concerns justified extension. 21 CFR § 21.40(b)(2). As petitioners make no claim to any legal justification for their inaction *before* the Bureau's denial of extensions, and the Bureau's refusal of credit for post-denial progress appears in line with Commission precedent (especially in light of its expressed intent to crack down on delays after 1985), we can find no error.

\* \* \*

■ Petitioners also challenge the Bureau's imposition of forfeitures of $2000 on each of the petitioners for engaging in unauthorized construction after expiration of their permits. In this context, they assert that the Commission staff was on notice of their intention to complete construction, and that the Commission's failure to object bars any liability for monetary forfeitures.

We do not have jurisdiction to address this argument. Section 504(a) of the Communications Act authorizes the collection of such forfeitures by a civil suit in district court. Monetary forfeitures "shall be recoverable ... in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office ...", and such a suit "shall be a trial de novo". 47 U.S.C. § 504(a). We have construed § 504 to confine initial review of forfeiture orders to the district courts. *Pleasant Broadcasting Co. v. FCC,* 564 F.2d 496, 500 (D.C.Cir.1977).

Accordingly, the petitions are *Denied.*